UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                             :

MARIO RINALDI,                    :
                             :
                Plaintiff,    :
                             :          16-CV-1901 (VSB)
        - against -         :
                             :      **OPINION & ORDER**
SCA LA GOUTTE, D'OR, SAS CH. &  :
A. PRIEUR,               :
                             :
                Defendants.  :
                             :
-------------------------------------------------------X

<u>Appearances</u>:

Thomas Edward Butler
Nicole Ann Sullivan
White and Williams LLP
New York, New York
*Counsel for Plaintiff and Counter Defendants*

Edward William Floyd
Eva-Maria Mayer
Nicholas Paine
Zachary Barger
Floyd Zadkovich LLP
New York, New York
*Counsel for Defendants and Counter Claimants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

       On March 4, 2022, a jury returned a verdict in favor of Plaintiff Mario Rinaldi

("Plaintiff" or "Rinaldi") on his breach of contract claim against Defendant SCA La Goutte,

D'Or ("La Goutte").  Before me are La Goutte's objections to Plaintiff's proposed judgment, and

La Goutte's motion for judgment as a matter of law or, in the alternative, motion for a new trial

and request for remittitur.  Because I find that (1) New York law entitles Plaintiff to prejudgment

interest of 9% per annum running from February 12, 2016, (2) La Goutte failed to meet its

substantial burden needed to warrant a judgment as a matter of law, and (3) La Goutte failed to

demonstrate that the jury reached a seriously erroneous result or that the verdict was a

miscarriage of justice, La Goutte's motions are DENIED and the Clerk of Court is respectfully

directed to enter an amended judgment including interest in accordance with this Opinion &

Order.

## I.    Factual Background and Procedural History[1]

This dispute concerns an oral agreement between Plaintiff and La Goutte, dating back to

the mid-1990s, that Plaintiff would act as a sales agent for La Goutte's brand of Paul Goerg

Champagne in the United States.  (*See generally* Doc. 1 ("Compl."); Doc. 39 ("Answer").)

Plaintiff claimed that the parties' oral agreement provided that Plaintiff would build the Paul

Goerg brand in the United States, buy the champagne from the winery on consignment, and use

the money he earned from commissions for brand marketing.  (*See, e.g.*, Trial Tr. 59:3-65:18.)[2]

In February 2016, La Goutte and the legal producer of Paul Goerg Champagne, Sas. Ch. & A.

Prieur ("Prieur") (together, "Defendants"), told Plaintiff that they were suspending shipments of

Paul Goerg Champagne to Plaintiff until Plaintiff paid purportedly outstanding invoices.  (*See*

Doc. 266-2 ("Pl.'s Trial Ex. P-60").)  Thereafter, on March 13, 2016, Plaintiff sued La Goutte for

breach of contract, and sued both Defendants for breach of fiduciary duty, tortious interference

with contractual relations, unfair competition, unjust enrichment, and promissory estoppel.

(Compl. ¶¶ 49–89.)[3]

---

[1] In this Opinion & Order, I presume familiarity with my Opinion & Order of September 9, 2020 and with this action's procedural history, so I will only give a brief overview here relevant to this Opinion & Order.

[2] "Trial Tr." refers to the full transcript of the trial in this matter, found across Docs. 212, 214, 216, 218, 220, 222, 224, 226, 228 and 230.

[3] Plaintiff initially sued the individuals Pascal Ferat, Jean Jacques Couchou Meillot, Herve Sanchez, and Etienne Godard as well, but on May 10, 2016, the parties filed a stipulation dismissing them from the action.  (Doc. 38.)

On May 18, 2016, Defendants filed counterclaims against Plaintiff for breach of contract, breach of fiduciary duty, and breach of obligations to Defendants as third-party beneficiaries, as well as a counterclaim against a third party, USA Wine Imports, Inc. ("USA Wine"), for breach of contract.  (Answer ¶¶ 141–63.)  On August 16, 2019, Defendants filed a motion for judgment on the pleadings.  (Doc. 103.)  On September 9, 2020, I granted Defendants' motion as to Plaintiff's claims for breach of fiduciary duty, tortious interference with contractual relations, unfair competition, unjust enrichment, and promissory estoppel.  (Doc. 108.)

The parties proceeded to trial on Plaintiff's breach of contract claim against La Goutte, and Defendants' breach of contract, breach of fiduciary duty, and breach of obligations counterclaims against Plaintiff and USA Wine.  The trial began on February 17, 2022 and lasted 10 days.  On March 4, 2022, an eight-member jury returned a unanimous verdict in favor of Plaintiff on his breach of contract claim against La Goutte, and awarded Plaintiff $1.5 million in general compensatory damages.  (Doc. 241 ("Verdict"), at 2.)  The jury found against Defendants on their counterclaims against Plaintiff and USA Wine.  (*Id.* at 3–6.)

On March 9, 2022, Plaintiff filed a proposed judgment.  (Doc. 232.)  On March 16, 2022, La Goutte filed objections to the prejudgment interest awarded in the proposed judgment.  (Doc. 238 ("J. Obj.").)  On March 23, 2022, Plaintiff filed a response.  (Doc. 242 ("J. Obj. Resp.").)  On March 25, 2022, La Goutte filed a reply.  (Doc. 243 ("J. Obj. Reply").)  On March 29, 2022, I entered judgment in this case, awarding Plaintiff $1.5 million in addition to any applicable post-judgment interest, with the caveat that "[b]ecause the calculation of pre-judgment interest is the subject of pending briefing, the Judgment will be amended as necessary to reflect the amount of any applicable pre-judgment interest once the issue is resolved."  (Doc. 246.)

On April 26, 2022, La Goutte filed a motion for judgment as a matter of law, (Doc. 247), a memorandum in support, (Doc. 248 ("Rule 50 Mem.")), and a declaration with exhibits in support, (Doc. 249).  The same day, La Goutte also filed a motion for a new trial, (Doc. 250), a memorandum in support, (Doc. 251 ("Rule 59 Mem.")), and a declaration with exhibits in support, (Doc. 252).  On June 1, 2022, Plaintiff filed a memorandum in opposition to La Goutte's motion for judgment as a matter of law, (Doc. 257 ("Rule 50 Opp.")), and a declaration with exhibits in support, (Doc. 258), and a memorandum in opposition to La Goutte's motion for a new trial, (Doc. 255 ("Rule 59 Opp.")), and a declaration with exhibits in support, (Doc. 256). On June 16, 2022, La Goutte filed a reply in support of its motion for judgment as a matter of law, (Doc. 261 ("Rule 50 Reply")), and a declaration with exhibits in support, (Doc. 262), and a reply in support of its motion for a new trial, (Doc. 259 ("Rule 59 Reply")), and a declaration with exhibits in support, (Doc. 260).

On July 11, 2022, I issued an order scheduling oral argument for August 9, 2022, and asking the parties for supplemental briefing on several issues.  (Doc. 263.)  On July 26, 2022, La Goutte filed its supplemental briefing, (Doc. 265 ("Def.'s Supp. Br.")), and a declaration with exhibits in support, (Doc. 266).  On August 2, 2022, Plaintiff filed its supplemental briefing, (Doc. 267 ("Pl.'s Supp. Br.")), and a declaration with exhibits in support, (Doc. 268).  On August 9, 2022, I held an oral argument in this case.  (Doc. 270 ("Oral Arg. Tr.").)

## II.   Legal Standards

### A.   *Prejudgment Interest*

"In a diversity case, state law governs the award of prejudgment interest."  *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008).  Under New York law,

> Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred.  Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y. C.P.L.R. § 5001(b).  New York law "grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest." *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994).

### B.    *Rule 50(b)*

Federal Rule of Civil Procedure 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1) ).  "Under Rule 50(a), a party may move for judgment as a matter of law ('JMOL') during trial at any time prior to the submission of the case to the jury." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (citing Fed. R. Civ. P. 50(a)(2)).  "The Rule requires the party making such a motion to specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.'" *Tolbert v. Queens Coll.*, 242 F. 3d 58, 70 (2d Cir. 2001) (internal quotation marks omitted) (citing Fed. R. Civ. P. 50(a)(2)).  "After an unfavorable verdict, Rule 50(b) allows the party to 'renew' its motion." *Galdieri-Ambrosini*, 136 F.3d at 286.  "The standard of review is the same whether the motion for judgment as a matter of law is submitted prior to the verdict being issued, or post-trial." *Lewis v. Am. Sugar Ref., Inc.*, 325 F. Supp. 3d 321, 348 (S.D.N.Y. 2018) (citing *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000)).

"A district court may grant a motion for judgment as a matter of law only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Emamian v. Rockefeller Univ.*, 823 F. App'x 40, 45 (2d Cir. 2020) (internal quotation marks omitted).  "Judgment as a matter of law should be granted only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against it." *Id.*  (internal quotation marks omitted).

## C.     *Rule 59*

"[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (internal quotation marks omitted).  "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict.  Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).  However, "the court should only grant such a motion when the jury's verdict is egregious," and the "court should rarely disturb a jury's evaluation of a witness's credibility." *Id.* (internal quotation marks omitted).

I.      **Discussion**

    A.      *Prejudgment Interest*

Generally, New York law requires that prejudgment interest "shall be recovered" on

damages for breach of contract claims at a rate of 9% per annum.  N.Y. C.L.P.R. §§ 5001, 5004.

Nevertheless, La Goutte argues that Plaintiff is not entitled to any prejudgment interest at all, for

three reasons.

First, La Goutte argues that Plaintiff cannot recoup prejudgment interest because

"prejudgment interest is not available for damages based on future losses."  (J. Obj. at 3.)  La

Goutte's argument is predicated on the assumption that the jury based its $1.5 million award on

Plaintiff's expert Pamela O'Neill's valuation of Plaintiff's lost business opportunity.  (*See id.*; J.

Obj. Resp. at 4; J. Obj. Reply at 6; *see also* Trial Tr. 754:24-855:11 (Ms. O'Neill's testimony

about her damages estimate).)  I agree with Plaintiff that La Goutte has not demonstrated that the

jury's award is necessarily based on Plaintiff's future losses alone, and that the jury could have

instead arrived at its $1.5 million award by considering Plaintiff's past losses.  (*See* J. Obj. Resp.

at 5.)  Regardless, even if the jury considered Ms. O'Neill's damages calculations about future

losses, Ms. O'Neill discounted her valuations to present value.[4]  (*See id.* at 4 (citing Trial Tr.

791:18-25)).  When future losses are discounted to present value, an award of prejudgment

interest is still required.  *See In re Conn. Nat'l Bank*, 928 F.2d 39, 43 n.5 (2d Cir. 1991) ("The

general proposition that prejudgment interest is not allowable on future losses . . . is inapplicable

to the sum of the 'present' value of future payments that have been discounted back to the date of

---

[4] Ms. O'Neill discounted her valuations to present value as of December 31, 2016, not the date of the breach, February 12, 2016.  (*See* Trial Tr. 791:18-25.)  Why Ms. O'Neill chose the date of December 31, 2016 was never explained.  (*See, e.g.*, Oral Arg. Tr. 7:14-8:9.)  However, given the uncertainty about how much of the jury's $1.5 million award was based on Ms. O'Neill's testimony versus other evidence, I find that this 10-month gap is not dispositive.

loss."); *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 09-CV-7199 AJN, 2015 WL 4900188, at *4 (S.D.N.Y. Aug. 17, 2015) (awarding prejudgment interest on damages based on future losses that had been discounted to the date of breach).  Defendants provide no legal authority to the contrary.  (*See, e.g.*, Oral Arg. Tr. 4:10-17.)  Therefore, Plaintiff is entitled to recoup prejudgment interest here, even if the jury award was based, in part, on Plaintiff's expert's projections of future losses.

Second, La Goutte argues that "the possibility exists that the jury award here already included interest in the award, and this precludes an additional award of prejudgment interest." (J. Obj. at 3.)  La Goutte cites Ms. O'Neill's testimony describing how she discounted her valuations to present value.  (*See id.* at 5 (citing Trial Tr. 782:14-25).)  Specifically, Ms. O'Neill said:

> [I]f I asked you would you rather have a dollar five years from now or would you rather have one today?  You'd rather have one today.  So just like interest in your bank account, if you keep money sitting there, you earn interest over time.  Present value is the flip of that.

(Trial Tr. 782:21-25.)  "New York law . . . provides that where there is a possibility that the jury award already allowed interest, no further prejudgment interest can be recovered on the verdict." *Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir. 1993).  However, a district court errs by "presuming that the jury included prejudgment interest in its damage award" where "the concept of prejudgment interest was at no point mentioned to the jury." *Gierlinger v. Gleason*, 160 F.3d 858, 874–75 (2d Cir. 1998).  The jury instructions in this case did not mention prejudgment interest at all, (*see generally* Trial Tr. 1385:1-1425:1), and neither party requested such instructions, (*see generally* Docs. 129, 130, 131).  Where, as here, the jury did not receive jury instructions on prejudgment interest, a fleeting reference to the concept of interest by

Plaintiff's expert cannot give rise to the presumption that the jury included prejudgment interest in its damage award.

Third, La Goutte argues that Plaintiff's "failure to address entitlement to prejudgment interest at trial and in his positions regarding jury instructions and verdict form" have created an "ambiguity in [the] jury award," which "should yield a presumption that the verdict amount included at least a substantial allocation to future losses, and/or the jury already included interest in the award." (J. Obj. at 5–6.)  This argument is meritless.  "Where an entitlement to prejudgment interest exists as a matter of law, its award may properly be determined by the court even after a jury verdict on damages."  *de Kwiatkowski v. Bear, Stearns & Co. Inc.*, No. 96CIV.4798(VM), 2000 WL 729118, at *5 (S.D.N.Y. June 6, 2000).  "It is only when an interest award is discretionary . . . that its recovery must be determined by the finder of fact."  *Id.*  Plaintiff is entitled to prejudgment interest as a matter of law, *see* N.Y. C.L.P.R. §§ 5001, 5004, so there was no reason to address entitlement to prejudgment interest in the jury instructions, and no adverse presumption arises from the failure to do so.

In the alternative, if prejudgment interest is awarded, La Goutte argues that the interest should be divided into two categories:  (1) prejudgment interest on the roughly $87,000 in unpaid commissions, which should be calculated starting on the date the commissions were due to be paid, which Plaintiff has the burden to establish, and (2) prejudgment interest on the remainder, which should be calculated starting on a "reasonable intermediate date" between the date La Goutte suspended shipments to Plaintiff, February 12, 2016, and the date of the jury verdict. (*See* J. Obj. at 6–9.)[5]  However, there is no need to determine a reasonable intermediate date here

---

[5] La Goutte suggests that in determining a "reasonable intermediate date," I should consider COVID-related delays and Plaintiff's choice "not to have the case decided by a bench trial that would have allowed trial to take place earlier."  (J. Obj. at 8.)  However, "[w]hen the precise date upon which damages were incurred is ambiguous, the

because Plaintiff's damages were not "incurred at various times." N.Y. C.P.L.R. § 5001(b). Instead, the jury was explicitly instructed, "Damages are measured as of the time of the breach." (Trial Tr. 1416:13-14.) Therefore, "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b). "In breach of contract cases, prejudgment interest is awarded from the date of the breach." *Bison Cap. Corp. v. ATP Oil & Gas Corp.*, 884 F. Supp. 2d 57, 59 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also Kaiser v. Fishman*, 590 N.Y.S.2d 230, 234 (2d Dep't 1992) (holding that the "trial court erred in awarding interest on damages for breach of contract from . . . the date of the commencement of the first trial" rather than from the date on which "the contract was breached" some three years earlier). Since the jury was instructed that "Mr. Rinaldi claims that . . . La Goutte breached the contract by refusing to fill Mr. Rinaldi's orders," (Trial Tr. 1403:12-13, 17-18), I agree with Plaintiff that February 12, 2016 was the date of the breach because it was the date that La Goutte advised Plaintiff that it would no longer ship him champagne. (*See* J. Obj. Resp. at 1, 12–13; *see also* Pl.'s Trial Ex. P-60.)

Therefore, I find that Plaintiff is entitled to prejudgment interest of 9% per annum on $1.5 million under New York law from February 12, 2016.

## B. *Rule 50*

La Goutte moves for judgment as a matter of law under Rule 50(b) on the grounds that no reasonable jury could have concluded that Plaintiff performed his duty under the contract. (*See*

---

date of commencement of the action is an appropriate date from which to compute damages," not the date of the jury verdict. *Hilt Constr. & Mgmt. Corp. v. Permanent Mission of Chad to United Nations in New York*, No. 16 CV 6421 (VB), 2019 WL 3564571, at *2 (S.D.N.Y. Aug. 6, 2019), *aff'd*, 860 F. App'x 764 (2d Cir. 2021) (citing *Conway*, 16 F.3d at 512 (collecting cases)). Therefore, even if I were to calculate a "reasonable intermediate date," COVID-related delays and Plaintiff's choice to exercise his constitutional right to a jury trial would be irrelevant.

*generally* Rule 50 Mem.)[6]  Specifically, La Goutte argues that Plaintiff failed to prove that he

paid his invoices on time and in full.  (*See id.* at 12–13 ("Plaintiff offered no affirmative

testimony or documentary evidence showing that every time one of his U.S. clients paid him, he

then made immediate payment in full on the winery's associated invoice.").)

"To prevail on a breach-of-contract claim in New York, a plaintiff must prove:  (1) the

existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by

the other party, and (4) damages attributable to the breach."  *Moreno-Godoy v. Kartagener*, 7

F.4th 78, 85 (2d Cir. 2021) (internal quotation marks omitted).  The jury was charged with

determining the terms of the oral contract.  *See Patten v. Pancoast*, 15 N.E. 893, 893 (N.Y. 1888)

("The contract . . . was oral; and in such a case it is the province of the jury, where the evidence

in respect of the terms of the contract and of the intent of the parties is conflicting, to decide what

was their agreement.").  The jury was instructed that Plaintiff had the burden of proving which

terms "were in fact part of the oral contract."  (Trial Tr. 1404:4-6; *see also* Trial Tr. 1310:20-

1311:11 (amending the jury charge as Defendants' counsel suggested).)  The jury also was

---

[6] I also asked the parties to brief the questions of whether the oral contract was terminable at will, and if so, whether I would "have authority to grant judgment as a matter of law" on those grounds, "even though La Goutte did not raise the issue in its Rule 50 motions."  (Doc. 263.)  Both parties cite *Rooney v. Tyson*, 91 N.Y.2d 685, 687 (1998), in which the New York Court of Appeals found, on a question certified by the Second Circuit, that an "oral personal services contract between a fight trainer and a boxer to last 'for as long as the boxer fights professionally' provides a definite legally cognizable duration" and therefore is not terminable at will.  (*See* Def.'s Supp. Br. at 2; Pl.'s Supp. Br. at 6.)  The parties appear to agree that because Plaintiff testified that the contract duration was for as long as Plaintiff could or wanted to continue working for La Goutte, (*see, e.g.*, Trial Tr. 150:22-151:4), a reasonable jury could have determined that the contract was not terminable at will, (*see* Def.'s Supp. Br. at 2–4; Pl.'s Supp. Br. at 3–12).

Regardless, I cannot reach the issue because "judgment as a matter of law is limited to those issues 'specifically raised in a prior motion for a directed verdict,'" and La Goutte did not raise the at-will issue in either its Rule 50(a) or Rule 50(b) motion.  *Cruz v. Loc. Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994) (internal citation omitted); *see also Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1131 (10th Cir. 2019) (finding the district court committed reversible error by sua sponte granting judgment as a matter of law on grounds the defendants never raised).  Although I "may grant judgment as a matter of law where no Rule 50 motion was made, if necessary to prevent 'manifest injustice,'" *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003), La Goutte does not argue that there has been manifest injustice here, (*see* Oral Arg. Tr. 21:25-22:10).  Therefore, I do not and may not consider whether a reasonable jury should have found that the oral contract was terminable at will.

instructed that "[a]n oral agreement may be an enforceable contract, as long as the terms are clear and definite, and so long as the conduct of the parties evinces mutual assent, also referred to as a 'meeting of the minds.'"  (Trial Tr. 1404:13-16.)  *See Kramer v. Greene*, 36 N.Y.S.3d 448, 450 (1st Dep't 2016).  The jury was further told that "[t]he intent of the parties is determined by considering their relationship, what they said and what they did and all of the surrounding circumstances."  (Trial Tr. 1405:10-12.)  *See* N.Y. Pattern Jury Instr.--Civil 4:1.1 (Dec. 2021).  Additionally, the jury was instructed that "[p]arties to a contract may agree to 'waive' performance requirements," so long as "the party clearly manifested their intent to give up their rights and . . . such a decision was knowingly made by the party after the party knew all of the relevant facts."  (Trial Tr. 1408:19-20, 1408:24-1409:2.)  *See also* 3 Fed. Jury Prac. & Instr. § 126:12 (6th ed.); *Gilbert Frank Corp. v. Fed. Ins. Co.*, 520 N.E.2d 512 (N.Y. 1988).

First, La Goutte argues there is "overwhelming undisputed evidence that demonstrates [Plaintiff] made untimely payments."  (Rule 50 Mem. at 1.)  However, I find that a reasonable jury had a sufficient evidentiary basis to conclude the parties' oral agreement did not require Plaintiff to make payments within any particular time period.  Although La Goutte's invoices formally had a payment due date of 60 days, La Goutte's bookkeeper Isabelle Grzeszezak testified that Plaintiff often made payments over a year after the purported due date.  (Trial Tr. 1073:1-6, 16-18; *see also* Trial Tr. 1052:14-19 ("Payments were made always very late. . . . I'm actually talking about years.  For instance, in 2012, he would begin paying invoices of 2011.").)  Etienne Godard, La Goutte's head of sales and marketing, testified that he did not recall the sales assistant in charge of invoicing raising any concerns about Plaintiff's invoices, nor did he recall anyone considering "cutting [Plaintiff] off because of the arrears."  (Trial Tr. 551:16-25, 555:16-17.)  Rather, for decades, La Goutte accepted Plaintiff's "late" payments, applying them towards

the oldest open invoices first, and continuing to pay Plaintiff his commissions.  (*See* Trial Tr. 987:15-23, 1073:23-1074:1).  USA Wine accounting department manager Christine Stroe testified that payment within 60 days was not in fact "feasible" because of the time required for shipping, customs, and pick-up.  (Trial Tr. 696:17-697:13.)  Meanwhile, Plaintiff's testimony suggested that any invoice due date was irrelevant; Plaintiff testified, "[W]e were working on consignment basis, which means that whatever wine I was receiving from the winery would be paid as it would get sold."  (Trial Tr. 463:20-22.)  Likewise, the jury heard testimony from former La Goutte President Pascal Ferat that, with regard to the time between when Plaintiff sold the wine and when Plaintiff paid La Goutte for the wine sold, "there can be a gap, but that gap cannot be too big."  (Trial Tr. 933:16-25.)  Mr. Ferat also testified that he personally discussed "all of the terms and obligations" of La Goutte's relationship with Plaintiff once the board had approved them, (Trial Tr. 918:11-16), but he did not recall discussing "how products would be invoiced," (Trial Tr. 966:16-19).  A reasonable jury could have concluded from the evidence that the parties had no meeting of the minds as to payment timing.

La Goutte responds that it had no way of knowing whether Plaintiff's payments were late because Plaintiff did not perform his duty to provide La Goutte an accounting of his sales.  (Rule 50 Reply at 7.)  La Goutte argues, based on case law, that in a consignment relationship, "after a sale, the supplier should be paid from that sale in full, with an accounting kept by the consignee." (Rule 50 Reply at 3.)  However, Plaintiff testified that from the beginning of the parties' relationship, La Goutte did not request that any specific information be supplied to the winery. (*See* Trial Tr. 464:23-465:1, 465:19-24.)  Plaintiff also testified that although USA Wines generated monthly reports containing sales information, La Goutte never asked Plaintiff for these reports, and Plaintiff did not routinely provide them to La Goutte.  (*See* Trial Tr. 357:8-359:4,

463:6-16.)  A reasonable jury could have concluded, considering all of the surrounding circumstances, that the parties' agreement did not require Plaintiff to provide an accounting to La Goutte, or that to the extent the parties' agreement did require an accounting or payment by a certain time, La Goutte manifested its intent to waive those performance requirements by continuing to pay Plaintiff his commissions despite his failure to perform.

Regardless of the payment timing issue, La Goutte argues that there is "overwhelming undisputed evidence" that Plaintiff "failed to pay his invoices." (Rule 50 Mem. at 1.)  In fact, Plaintiff vigorously disputed the evidence about his purported debts.[7] (*See, e.g.*, Trial Tr. 233:2-235:25 (Plaintiff testified that La Goutte had used an erroneous euro-to-dollar exchange rate), 237:17-238:11 (Plaintiff testified that he asked for a ledger showing invoices with the exchange rate used, but never received one), 431:12-432:17 (Plaintiff testified that he had challenged the accuracy of invoices after incurring a $120,000 loss due to exchange rate manipulation).)  The primary evidence of Plaintiff's purported debt was from Ms. Stroe, who testified about a spreadsheet she created showing that Plaintiff owed La Goutte $272,554.82.  (*See* Trial Tr. 612:15-669:3, 679:7-708:25; Doc. 249-3 (Defs.' Ex. D-25).)  Ms. Stroe testified that she created the spreadsheet in 2016 at La Goutte's request and made no efforts to review it for accuracy. (Trial Tr. 626:16-21, 638:25-639:8.)  Indeed, both Plaintiff's counsel and Defendants' counsel identified purported errors in Ms. Stroe's spreadsheet on direct and cross-examination.  (Trial Tr. 637:24-638:10 (Ms. Stroe agreed it was "correct to say" the $272,554.82 balance was "inflated" because of the conversion rate used), 645:4-8 (Ms. Stroe agreed that it appeared "that the $100,580.80 entry for invoice No. 20130503 got dropped from the calculations"), 656:16-20

---

[7] Although La Goutte argues that "Plaintiff's own counsel acknowledged the fact of an existing debt owed by Plaintiff in summation," (Rule 50 Mem. at 8), the jury was explicitly instructed multiple times that "the final arguments of the parties . . . do not constitute evidence," (Trial Tr. 1385:12-13; *see also* Trial Tr. 42:2-13, 51:6-12, 1388:21-1389:2).

(Ms. Stroe agreed the $272,554.82 balance "appears to be off by at least $160,000"), 656:21-25 (Ms. Stroe agreed the spreadsheet was missing a $3,800 invoice).)  "In deciding a Rule 50 motion, the Court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Malmsteen v. Berdon, LLP*, 595 F. Supp. 2d 299, 303 (S.D.N.Y. 2009), *aff'd*, 369 F. App'x 248 (2d Cir. 2010) (internal quotation marks omitted).  "A jury is entitled to believe some parts and disbelieve other parts of the testimony of any given witness, and need not accept a given witness's testimony even if it is uncontradicted." *Id.* (internal quotation marks omitted); *see also Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 173 (E.D.N.Y. 2012) ("W]hen ruling on a motion brought pursuant to Rule 50, the court . . . must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury.") (internal citations omitted)).  In light of the questions raised about Ms. Stroe's testimony, a reasonable jury could have rejected or discounted her testimony about Plaintiff's debts.[8]

In addition or in the alternative, a reasonable jury could have concluded that, even to the extent that Plaintiff owed certain debts to La Goutte, because payment timing was not an element of the parties' agreement, those outstanding debts had not yet come due by the time of La Goutte's breach on February 12, 2016.  For example, Ms. Stroe testified that there were no open invoices from 2011 and 2012.  (*See* Trial Tr. 640:3-6.)  The jury may have concluded that any outstanding debts were incurred fairly recently.  "Where there is no express provision in a contract relating to time of performance, a reasonable time is implied.  The question of whether performance has been delayed beyond a reasonable time is for the jury." *Lake Steel Erection,*

---

[8] Separately, Ms. Grzeszezak erroneously testified that La Goutte's internal accounting system showed Plaintiff's balance in Euros as of the end of 2014 was €290,062.74, (Trial Tr. 1066:19-24); in fact, an exhibit demonstrated that the balance as of the end of 2014 was €390,052.74, (Doc. 249-6 ("Def.'s Ex. D-55").)  A reasonable jury could have discounted this testimony as well.

*Inc. v. Egan*, 403 N.Y.S.2d 387, 389 (4th Dep't 1978) (internal citation omitted).  In sum, it was within the jury's province to determine whether Plaintiff's invoices were overdue, and a reasonable jury would have a legally sufficient basis to determine they were not.

Moreover, the jury's verdict as to Plaintiff's breach of contract claim is entirely consistent with the jury's verdict as to Defendants' breach of contract counterclaim.  (*Compare* Verdict at 2 *with id.* at 3.)  The jury was instructed that "La Goutte and Prieur claim that Mr. Rinaldi failed to pay invoices for certain shipments of Paul Goerg champagne."  (Trial Tr. 1406:5-7.)  On Defendants' counterclaim, the jury was told that Defendants had the burden of proving that

> (1) La Goutte and Prieur entered into a contract with Mr. Rinaldi for payment of shipments of Paul Goerg champagne;
>
> (2) La Goutte and Prieur did what they were required to do under the contract;
>
> (3) Mr. Rinaldi breached the contract by not doing what he was required to do under the contract; and
>
> (4) La Goutte and Prieur sustained damages because of Mr. Rinaldi's breach of that contract.

(Trial Tr. 1406:18-25.)  In response to the question, "Did La Goutte and Prieur prove their breach of contract counterclaim against Mr. Rinaldi?" the jury answered, "No."  (Verdict at 3.) The verdict suggests that the jury simply rejected Defendants' evidence.  In ruling on La Goutte's Rule 50 motion, I "must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury." *Welch*, 871 F. Supp. 2d at 173.

In sum, a reasonable jury would have a legally sufficient evidentiary basis to find that the parties' oral contract did not require payment by a certain time, provision of sales records, or

one-time payment in full, and that Plaintiff therefore did not fail to perform his obligations under the contract.  Accordingly, La Goutte's motion for judgment as a matter of law is DENIED.

### C. *Rule 59*

In addition, or in the alternative, La Goutte moves for a new trial.  (*See* Rule 59 Mem.) The essence of La Goutte's motion for a new trial is its ongoing challenge to Plaintiff's expert testimony.  At trial, Ms. O'Neill testified that she had valued Plaintiff's damages at $3.5 million.  (Trial Tr. 754:24-755:2.)  To arrive at $3.5 million, she "used two methods" and "averaged them together":  Ms. O'Neill valuated Plaintiff's lost business opportunity at $3.7 million, and valuated the Paul Goerg brand at $3.3 million, and found the average of her valuations was $3.5 million.  (Trial Tr. 755:5-11.)  To calculate Plaintiff's lost business opportunity and the valuation of the Paul Goerg brand, Ms. O'Neill relied on projections created by third-party investment bank Oberon Securities ("Oberon"), which Plaintiff had retained in 2015 to assist him in securing outside financing to grow the Paul Goerg brand.  (*See* Trial Tr. 238:17-239:19, 792:10-13, 803:3-6.)  La Goutte moves for a new trial under Rule 59 on the grounds that $1.5 million damages award was excessive and that the jury was unduly swayed by the Oberon documents, which La Goutte argues should have been excluded.  (Rule 59 Mem. at 1.)  La Goutte asks me to order a new trial and remittitur in the amount of $89,241.20, representing Plaintiff's unpaid commissions.  (*See id.*)[9]

Defendants' challenges to the Oberon documents have a long history.  In discovery, Defendants never deposed anyone from Oberon.  (*See* Trial Tr. 32:5-10; *see also* Trial Tr.

---

[9] On reply, La Goutte suggests that remitter of $500,000 based on a lost income calculation "would at least have some support in the record," "without prejudice to its rights to dispute damages on that theory."  (Rule 59 Reply at 10.)  I disregard this suggestion because it was raised for the first time on reply.  *See Haywin Textile Prods., Inc. v. Int'l Fin. Inv. and Commerce Bank Ltd.*, 137 F. Supp. 2d 431, 434 n.2 (S.D.N.Y. 2001) ("It is well settled that courts should not consider arguments first raised in a party's reply brief which afford no opportunity for response from the opposing party.").

128:11-22, 610:16-23, 883:1-12.)  Before trial, Defendants moved to exclude Oberon's

projections under Federal Rules of Evidence 401, 402, and 403, (Docs. 118, 178), and Ms.

O'Neill's testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587–92

(1993), (Doc. 116).  I denied all three motions.  (Docs. 167, 189.)  At trial, Defendants objected

that, despite a certification from Plaintiff's counsel that the Oberon documents were created in

2015, certain Oberon documents appeared to have been created or modified after 2015, in

anticipation of the litigation that began in 2016.  (*See* Trial Tr. 27:9-33:9; *see also* Doc. 252- 2

("Pl.'s Ex. P-55").)  Defendants argued that they should be permitted to cross-examine Oberon

partner Nicole Schmidt about when the Oberon documents were created, outside the presence of

the jury pursuant to Federal Rule of Evidence 104(a).  (*See* Trial Tr. 126:13-19, 511:10-512:22,

516:23-518:11, 519:2-11, 520:6-522:14; *see also* Trial Tr. 517:7-9 ("These are all admissibility

issues that we would like the Court to decide before the jury has the opportunity to hear it.").)

Defendants argued that if and when the Oberon documents were admitted under the business

records exception, "the jury then could weigh[] it however they choose."  (Trial Tr. 520:15-18.)

Plaintiff limited the Oberon documents he sought to admit to just two pages, in what became

Plaintiff's Exhibit 55.  (Trial Tr. 513:17-514:2; *see also* Pl.'s Ex. P-55.)  Accordingly, outside

the presence of the jury, Plaintiff called Ms. Schmidt to authenticate Plaintiff's Exhibit 55, and

Defendants cross-examined her.  (*See* Trial Tr. 586:22-608:21.)  Ms. Schmidt testified that the

Oberon documents in Plaintiff's Exhibit 55 "were prepared in 2015 to [her] recollection."  (Trial

Tr. 589:9-11; *see also* Trial Tr. 600:15-19, 601:19-20, 602:7-8, 603:7-8.)  Defendants objected to

admission of Plaintiff's Exhibit 55 on the grounds of relevance and hearsay.  (*See* Trial Tr.

713:1-19.)  I overruled both objections and explained that "[t]he witness was clear that she

believes it's her recollection that those were created in 2015."  (Trial Tr. 609:19-610:4.)  I

allowed Plaintiff to be recalled to the stand, where he likewise testified on cross-examination that the Oberon documents in Plaintiff's Exhibit 55 were created in 2015.  (*See* Trial Tr. 722:17-21.) Defendants also cross-examined Ms. O'Neill about her analysis of the Oberon documents.  (*See* Trial Tr. 810:25-813:24, 823:18-824:1, 828:6-830:5, 836:3-838:1, 848:23-849:9, 849:10-14.) Thereafter, Plaintiff's counsel informed me that Defendants had served a trial subpoena on Ms. Schmidt, and that Plaintiff objected to the subpoena.  (*See* Trial Tr. 876:14-877:5, 879:3-884:25.) Rather than allow Defendants to recall Ms. Schmidt, I allowed the Defendants "to review her testimony and to read back to the jury her testimony related to the Oberon documents."  (Trial Tr. 913:16-24.)  Defendants ultimately declined to do so.  (*See* Trial Tr. 1220:12-22, 1221:4-9, 1255:10-18.)

La Goutte now argues that "by truncating the initial Oberon production down to two pages of summaries and then not even calling an Oberon representative to the stand to testify as to its veracity and when it was created, Plaintiff put La Goutte in a prejudicial position."  (Rule 59 Mem. at 18.)  However, to the extent there is any prejudice here, it is a problem of the Defendants' own making.  Prior to trial, Defendants chose not to depose a representative from Oberon.  Then at trial—perhaps because they had not deposed a representative from Oberon and did not know what an Oberon representative might say—Defendants zealously advocated that the jury should be barred from the courtroom during Ms. Schmidt's testimony about the "veracity" of Plaintiff's Exhibit 55.  (*See* Trial Tr. 126:13-19, 511:10-512:22, 516:23-518:11, 519:2-11, 520:6-522:14.)  Moreover, after Ms. Schmidt laid the foundation for Plaintiff's Exhibit 55 to be admitted under the business records exception, Defendants were still given the opportunity to attack the evidence on cross-examination of Plaintiff and Ms. O'Neill.  (*See* Trial Tr. 720:24-739:15, 809:13-858:15.)  I also explicitly told Defendants that they could cross-

examine Plaintiff about the additional Oberon documents that were not included in Plaintiff's Exhibit 55.  (Trial Tr. 611:1-3 ("[T]here are certain documents that aren't in evidence, but on cross-examination you can cross-examine him using those if that's your desire.").)  Finally, I gave Defendants the chance to read Ms. Schmidt's testimony to the jury, which Defendants chose not to do.  (*See* Trial Tr. 913:16-24, 1220:12-22, 1221:4-9, 1255:10-18.)  "Certainly, a trial court should not grant a new trial simply because, like the proverbial second bite at the apple, the losing party believes it can present a better case if afforded another chance."  *LiButti v. United States*, 178 F.3d 114, 118–19 (2d Cir. 1999); *see also Globus v. L. Rsch. Serv., Inc.*, 418 F.2d 1276, 1289 (2d Cir. 1969) (denying a motion for a new trial where the defendant's "strategy in trying the case may have contributed to any confusion the jury may have experienced").  Defendants' strategic choice to cross-examine Ms. Schmidt about the Oberon documents outside the presence of the jury cannot be grounds for giving Defendants a do-over of the entire trial.

Assuming that the Oberon documents and Ms. O'Neill's testimony about them are unreliable and improperly admitted, La Goutte contends that the only "stable foundation" for a general damages award was the amount that Defendants owed Plaintiff for unpaid commissions, which was $89,241.20.  (*See* Rule 59 Mem. at 14.)  Therefore, La Goutte argues that the remainder of the award "must have been arrived at by impermissible means," whether "by speculation, impermissible setoff calculation, or as part of an 'illegitimate compromise verdict.'" (*Id.*)  This argument is entirely conclusory.  The fact that the $1.5 million damages award was not one proposed by the parties does not mean that it is necessarily unwarranted.  "[T]his was not a case where the plaintiff was entitled to all or nothing.  Instead, the jury was well within its power to draw its own conclusions as to the damages [Plaintiff] suffered."  *Lewis v. City of New York*, 689 F. Supp. 2d 417, 427 (E.D.N.Y. 2010) (internal quotation marks omitted); *see also*

*Maher v. Isthmian Steamship Co.*, 253 F.2d 414, 417 (2d Cir. 1958) ("[I]f, in the opinion of the reviewing court, the jury could have disbelieved the plaintiff's evidence . . . a verdict for plaintiff in an amount less than was sought will not be set aside." (internal citations omitted)).   The jury could have credited some parts of Ms. O'Neill's valuations and discounted other parts.  (*See* Pl.'s Supp. Br. at 22–25.)  The jury could have considered the $2 million that Plaintiff testified that he invested in the Paul Goerg brand, but decided Plaintiff's $2 million estimate was too high in light of Defendants' challenges to Plaintiff's credit card statements.  (*See* Rule 59 Opp. at 7.)  The jury was duly instructed that "[t]he basic principle of damages in a contract action is to leave the injured party in as good a position as he or she would have been if the contract had been fully performed."  (Trial Tr. 1416:6-8.)  Moreover, the jury was advised that "[c]omputing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork."  (Trial Tr. 1415:23-25.)   Juries are presumed to follow their instructions, *see United States v. Williams*, 690 F.3d 70, 77 (2d Cir. 2012), and La Goutte has not presented anything to overcome that presumption, such that a new trial is mandated.

In general, La Goutte argues that "[t]he rule governing new trial motions has less stringent standards than the rule governing motions for judgment as a matter of law" because "the trial judge is free to weigh the evidence independently."  (Rule 59 Reply at 1.) Nevertheless, the Second Circuit has cautioned that "trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge . . . may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (internal quotation marks omitted).  Moreover, "[w]here there is no particular discernable error, a jury's award may not be set aside as excessive unless 'the award is so high as to shock the

judicial conscience and constitute a denial of justice.'"  *Webber v. Dash*, No. 19-CV-610 (RWL), 2022 WL 2129025, at *4 (S.D.N.Y. June 14, 2022) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988)).  The award here, less than half of what Plaintiff's expert proposed, cannot be said to shock the conscience.  Since the verdict is not egregious, I must not disturb the jury's determination as to the amount of Plaintiff's damages, and I decline to set aside the verdict or order remittitur.  *See DLC Mgmt. Corp.*, 163 F.3d at 134.

## II.    Conclusion

For the foregoing reasons, La Goutte's objections to Plaintiff's proposed judgment, La Goutte's motion for judgment as a matter of law, and La Goutte's motion for a new trial and request for remittitur are DENIED.

WHEREAS, a jury trial was held in the above-captioned action before the Honorable Vernon S. Broderick, United States District Court Judge, commencing on February 17, 2022 and lasting ten (10) days;

WHEREAS, after due deliberation, the jury returned a verdict in favor of Plaintiff Mario Rinaldi ("Plaintiff") in this action in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00);

WHEREAS, Plaintiff is entitled under New York law to prejudgment interest of 9% per annum running from February 12, 2016 in the amount of Eight Hundred Eighteen Thousand Five Hundred Six Dollars and 85/100 ($818,506.85); and

WHEREAS, Plaintiff is entitled to post-judgment interest pursuant to 28 U.S.C.S. § 1961;

IT IS HEREBY ORDERED, ADJUDGED and DECREED that Plaintiff Mario Rinaldi has judgment against Defendant SCA La Goutte d'Or in the amount of Two Million Three

Hundred Eighteen Thousand Five Hundred Six Dollars and 85/100 ($2,318,506.85) in addition

to any applicable post-judgment interest.

The Clerk of Court is respectfully directed to (1) terminate any open motions, (2) enter an

amended judgment including interest in accordance with this Order, and (3) close this case.

SO ORDERED.

Dated: December 2, 2022
      New York, New York

Vernon S. Broderick
United States District Judge